UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANETTE L. SHAFER,

                        Plaintiff,

          -against-

ANDREW SAUL,
Commissioner of Social Security,

                        Defendant.

20cv3060 (VSB) (DCF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE VERNON S. BRODERICK, U.S.D.J.:**

This is the second time that this matter is before the Court on appeal from the Social

Security Administration's ("SSA's") denial of the application of plaintiff Janette Shafer

("Plaintiff") for Social Security Disability Insurance ("SSDI") benefits.  After Plaintiff's initial

denial of benefits in 2016 (on an application she had filed in 2012), Plaintiff appealed to the

Court, and, upon a Report and Recommendation by the Honorable Stewart D. Aaron, U.S.M.J.,

which was adopted by the Honorable Loretta A. Preska, U.S.D.J., the case was remanded for

further proceedings.  On remand, the same Administrative Law Judge ("ALJ") who had

originally held a hearing and denied Plaintiff's claim conducted a second hearing, after which, in

2020, he denied the claim again, ultimately giving rise to this second judicial appeal.

Once again, Plaintiff seeks review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant" or the "Commissioner"), denying her SSDI

benefits under the Social Security Act (the "Act") on the grounds that, for the relevant period,

Plaintiff's impairments did not render her disabled under the Act.  Currently before the Court are

Plaintiff's motion for judgment on the pleadings reversing the Commissioner's decision

(Dkt. 16), and Defendant's cross-motion for judgment on the pleadings affirming that decision

(Dkt. 23).   For the reasons set forth below, and principally because, on the prior remand, the ALJ

did not follow the Court's directive, I respectfully recommend that Plaintiff's current motion be

granted, that Defendant's cross-motion be denied, and that this case again be remanded to the

SSA.

## BACKGROUND[1]

### A.       Plaintiff's Application for SSDI Benefits

Plaintiff filed her application for SSDI on August 15, 2012 (R., at 18), alleging a

disability onset date of July 21, 2010 (*see id.*; *see also id.*, at 220).   Her claim of disability was

based on asserted conditions of degenerative disc disease, osteoarthritis of the lower back,

depression, post-traumatic stress disorder ("PTSD"), severe nerve damage on the left side, severe

chronic migraines, severe chronic lower back pain, "blood issue[]s," low iron, and deep vein

thrombosis ("DVT"), which resulted in the placement of a stent.   (*See id.*, at 224 (Plaintiff's

Disability Report), 370, 1077.)   When Plaintiff's claims were initially denied on February 15,

2013 (*id.*, at 87-101), she requested a hearing before an ALJ, and the first such hearing was held

before ALJ Michael Stacchini on March 13, 2014 (*id.*, at 45-86 (the "2014 Hearing")).

### B.       Evidence That Was Before the ALJ at the 2014 Hearing

Plaintiff's personal and employment history, as well as the medical evidence that was

before the ALJ when he issued his initial opinion on March 26, 2015, are detailed in

Magistrate Judge Aaron's prior Report and Recommendation.   *See Shafer v. Colvin*,

No. 16cv7941 (LAP) (SDA), 2018 WL 4233812 (S.D.N.Y. Feb. 15, 2018), *report and*

---

[1] The background facts set forth herein are taken from the SSA Administrative Record
(Dkt. 15) (referred to herein as "R." or the "Record").

*recommendation adopted*, 2018 WL 4232914 (Sept. 4, 2018).[2]  As familiarity with that Report and Recommendation is assumed, this Court will include here only a brief summary of the factual evidence that, as Judge Aaron described, was before the ALJ at the time of the 2014 Hearing.

In short, that evidence showed that Plaintiff was 33 years old at the time of the alleged onset of her disability, and that her last prior work had been as a school lunch server.  (*See* R., at 1134.)  Upon experiencing an episode of syncope (fainting) on July 13, 2010, Plaintiff was taken to the Emergency Center of Vassar Brothers Medical Center, after which she underwent back surgery on July 24, 2010.  (*See id.*, at 1135-36.)  Following the surgery, she complained of pain and anxiety, and she was treated for both with prescription medication.  (*See id.*, at 1136.)  She also began to see doctors at the Greater Hudson Valley Family Health Center ("GHV") for general medical care (*see id.*), and, in September 2010, she began treating with a neurologist, Dr. Syed Nasir, of the Brain Center of Hudson Valley, although Dr. Nasir's treatment notes from that time were not initially included in the Record (*see id.*).[3]

In October 2010, Plaintiff underwent MRIs of her lumbar spine, brain, and cervical spine, all of which showed certain abnormalities.  (*See id.*)[4]  Upon continuing to report complaints of

---

[2] Judge Aaron's 2018 Report and Recommendation has been made part of the Administrative Record for this appeal (*see* R., at 1133-56), as has Judge Preska's 2018 Order, adopting that Report and Recommendation (*see id.*, at 1157-58), and, in citing to either herein, this Court will refer to pages of the Record.

[3] Plaintiff was apparently treated regularly by Dr. Nasir from September 2010 through at least March 2015.  (*See* R., at 1142 (noting that Plaintiff had over 50 appointments with Dr. Nasir over that period).)  At the time of the initial hearing, however, it appears that only a few records of that treatment were included in the Record.  (*See id.*; *see also id.*, at 319, 935-45).)

[4] The 2018 R&R contains a typographical error in citing the date of the brain and lumbar-spine MRIs as October 29, 2012 (*see* R., at 1136); the Record reflects that those MRIs were conducted on October 29, 2010 (*see id.*, at 777-78).

anxiety and depression in 2011, Plaintiff visited a psychiatric clinic at GHV and was again treated with psychiatric medication.  (*See id*., at 1137.)  Also, to address her continued symptoms of pain, including recurring headaches and back pain, Plaintiff began seeing, among others, a pain-management specialist (Dr. Sunitha Polepalle), who treated her with trigger-point injections (*see id.*).

In November of 2011, Plaintiff experienced another fainting episode, for which she went to the emergency room at St. Luke's Cornwall Hospital ("St. Luke's Cornwall"), complaining, as well, at that time, of headaches and pain in her back and legs.  (*See id.*, at 1138.)  On that occasion, she was treated with medication and released (*see id.*), but, in February 2012, she was admitted to St. Luke's Cornwall, this time for five days, upon her reports that she had been frequently falling, had increased back pain, and could not walk (*see id.*, at 1139).  Imaging studies did not show significant developments since her previous MRIs, but an attending psychiatrist changed her psychiatric medications, and, upon her discharge, she was referred for outpatient psychiatric treatment.  (*See id*.)

After that, Plaintiff continued to seek psychiatric care, and it was noted in 2012, by the Orange County Department of Mental Health, that she suffered from depressive disorder.  (*See id*., at 1140.)  She also continued to receive general medical care at GHV, and to receive pain-management care from Dr. Polepalle, who administered additional injections to address her reported pain.  (*See id*., at 1139-40.)  In June 2012, Plaintiff was seen twice again in the hospital emergency room, including for pain and following a fall.  (*See id.*, at 1140.)  In 2013, she was referred to a neurosurgeon for her chronic neck and back pain; that doctor noted that, in addition to pain, Plaintiff had weakness and sensory loss in her extremities.  (*See id.*, at 1141.)  Plaintiff also saw a specialist for her episodes of recurrent fainting.  (*See id*.)  Throughout 2013 and 2014,

Plaintiff also continued to visit doctors at GHV.  (*See id.*, at 1142.)  Finally, for 2014, the Record contained notes from two of Plaintiff's appointments with Dr. Nasir, from February and March of that year (*see supra*, at n.3), at which times Plaintiff complained of headaches, back pain (aggravated by physical activity), and paresthesia[5] in her left lower extremity.  (*See* R., at 1142; *see also id.*, at 938-43.)  Dr. Nasir recorded Plaintiff's diagnoses as including tremor, syncope and collapse, lumbosacral radiculopathy,[6] cervical radiculitis,[7] headache, and cerebral atherosclerosis[8]; he noted, *inter alia*, that she fell easily and had anxiety; and he apparently treated her for, *inter alia*, migraines, lightheadedness, and a lack of balance.  (*See id.*)

As for opinion evidence in the Record, the ALJ had before him *no* medical source statements, containing any functional assessments of Plaintiff's work-related abilities, from *any* treating source.  The medical opinion evidence that was contained in the Record included only consultative assessments, made by (1) Dr. Kautilya Puri, who conducted a consulting neurological examination of Plaintiff in 2012 (*see id.*, at 653-56); (2) Dr. Alex Gindes, Ph.D., who conducted a consulting psychiatric examination, also in 2012 (*see id.*, at 648-52); (3) Dr. Lauren Hoffman, who, based solely on a record review, provided an assessment of Plaintiff's mental RFC (*see id.*, at 94-96, 98-99); and (4) Amanda Ossenfort (Ossenfort), a

---

[5] Paresthesia is "numbness or a burning feeling that occurs most often in the extremities" and is often referred to as "pins and needles." https://www.medicalnewstoday.com/articles/318845.

[6] "Lumbosacral radiculopathy is a term used to describe a pain syndrome caused by compression or irritation of nerve roots in the lower back." https://www.ncbi.nlm.nih.gov/books/NBK430837/.

[7] Cervical Radiculitis refers to a pinched nerve in the cervical spine. https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy.

[8] Cerebral atherosclerosis is a build-up of plaque in the blood vessels of the brain. https://www.neurosurgery.columbia.edu/patient-care/conditions/atherosclerosis.

non-physician "disability analyst" who provided an assessment of Plaintiff's physical RFC.  (*See*

*generally id.*, at 96-98, 1150.)  Each of those consultants opined that Plaintiff was able to work,

although with certain limitations.  (*See id.*)

      **C.**     **The ALJ's 2015 Decision, and the Errors in**
                 **That Decision That Were Identified by the Court**

After the 2014 Hearing, ALJ Stacchini issued an unfavorable decision, finding that

Plaintiff was not disabled.  (R., at 18-34 (the "2015 ALJ Decision").)  Plaintiff sought review of

the 2015 ALJ Decision by the Appeals Council, and, in connection with her appeal, obtained and

submitted approximately 123 pages of additional records from Dr. Nasir, for the period from

September 27, 2010 through March 26, 2015.  (*Id.*, at 319.)  The Appeals Council, however,

denied Plaintiff's request for review on August 31, 2016 (*id.*, at 1-3), making the ALJ's decision

the final decision of the Commissioner.  As noted above, Plaintiff then filed an appeal in this

District, resulting in a remand for further proceedings.  (*See id.*, at 1157-58, 1159.)  The errors

that were identified by the Court at that time, and that led to remand, were as follows:  (1) the

ALJ had failed to develop the record, by neglecting to seek opinion evidence or an RFC

assessment from Dr. Nasir or an alternative treating source; (2) the ALJ failed to discuss even the

limited medical evidence from Dr. Nasir that was in the record before the ALJ's decision was

issued, and the Appeals Council similarly failed to address the additional records from Dr. Nasir

that Plaintiff presented to it on her administrative appeal; and (3) the ALJ failed to provide a

sufficient basis for his determination that Plaintiff had the residual functional capacity ("RFC")

to perform light work.  (*See id.*, at 1149-55.)

More specifically, with regard to the ALJ's failure to develop the Record, the Court

found that, while the ALJ had taken "multiple steps" to obtain Dr. Nasir's records, "the ALJ

never sought Dr. Nasir's *opinion* with respect to whether [Plaintiff] [was] disabled."  (*Id.*, at

1149 (emphasis added).)  The Court acknowledged that the Record showed that it had been

difficult to obtain records and information from Dr. Nasir's office, but noted that it did "not

necessarily follow that Dr. Nasir would have refused to provide an opinion report or complete a

questionnaire," and that, even if Dr. Nasir had so refused, "the ALJ could have sought a

functional capacity assessment from an alternative source." (*Id.*, at 1150.)  On this point, the

Court determined that "the consultative examinations in the [R]ecord were not sufficient to

overcome this deficiency" (*id*.), as the only function-by-function assessment related to Plaintiff's

physical abilities (including her ability to sit and stand) was performed by Ossenfort, who was

not a physician, and the only such assessment related to Plaintiff's mental conditions had been

performed by Dr. Hoffman, "who had never seen [Plaintiff] in person and lacked a complete set

of [her] medical records" (*id.*, at 1150-51).  The Court also noted that the ALJ's failure to satisfy

his "threshold requirement" to develop the Record meant that he could not "even begin to

discharge his duties . . . under the treating physician rule."[9] (*Id.*, at 1152 (quoting *Barrie on*

*behalf of F.T. v. Berryhill*, No. 16cv5150 (CS) (JCM), 2017 WL 2569913, at *10 (S.D.N.Y.

June 12, 2017)).)

    As for the ALJ's failure to discuss the medical evidence that *was* available from

Dr. Nasir, the Court noted that Dr. Nasir was Plaintiff's long-standing treating physician, but that

the evidence available from Plaintiff's appointments with him was not even "substantively

mentioned" in the ALJ's decision.  (*Id.*)  The Court explained that, while there was no "opinion

report" from Dr. Nasir in the Record, "the ALJ did receive consultation notes from two of

---

[9] Although, in accordance with Revisions to Rules Regarding the Evaluation of Medical
Evidence, 82 Fed. Reg. 11 (Jan. 18, 2017), the treating physician rule, as described herein (*see*
Discussion, *infra*, at Section I(D)), is no longer in effect for applications made to the SSA on or
after March 27, 2017, it was and remains applicable to Plaintiff's application, which was made
well before that date.

[Plaintiff's] appointments with Dr. Nasir from February and March 2014," and that the ALJ's failure to address those notes in any way necessitated remand.  (*Id.*, at 1152-53; *see also id.*, at 1153 (noting that the ALJ's failure to discuss those records meant that the Court could not determine whether the ALJ had properly applied the treating physician rule).)  By extension, the Court likewise found that the Appeals Council's failure to discuss the additional treatment records from Dr. Nasir that were placed before it by Plaintiff also constituted legal error.  (*See id.*, at 1154.)

Finally, as to the ALJ's RFC assessment, the Court found that the ALJ had pointed to no support in the medical record for his conclusion that Plaintiff could sit, stand, lift, and carry to the extent required to perform light work, and that his conclusory statement that Plaintiff was capable of such work was not sufficient to enable the Court to decide the RFC determination was supported by substantial evidence."  (*Id.*, at 1152-55.)

###    D.    Evidence Added to the Record Prior to the Hearing on Remand

As already noted, the Record was supplemented, at the time of Plaintiff's administrative appeal, with additional treatment records from Dr. Nasir.  Further, before the ALJ conducted a new hearing on remand, other additional medical evidence was also obtained and made part of the Record.  This Court notes, however, that a significant portion of that evidence consisted of treatment records that post-dated June 30, 2016, Plaintiff's "date last insured."  (*See* R., at 1071.)  As most of those records shed little light on Plaintiff's condition during the relevant period, this Court will primarily summarize, below, the newly obtained records that were generated within the period covered by Plaintiff's claim for benefits.[10]

_____

[10] *See Shook v. Comm'r of Soc. Sec.*, No. 12-CV-185 TJM/VEB, 2013 WL 1213123, at *6 (N.D.N.Y. Jan. 25, 2013) ("information provided after the date last insured should be considered

      1.      **Additional Records From Dr. Nasir**

      The additional treatment records from Dr. Nasir (R., at 946-1066) show that Plaintiff saw

Dr. Nasir as early as September 27, 2010, and that she complained, at that time, of headaches,

paresthesia of the left lower extremity, low back pain, and numbness in her left leg.  (*Id.*, at

1063.)  Dr. Nasir noted that Plaintiff's speech was "fluent"; her comprehension and language

were "intact"; and she was alert and oriented "x3" (meaning that she was oriented to person,

time, and place) (*id.*); and he further noted that her mood and affect was "normal" and her

memory was "good."  (*Id.*, at 1064.)  As to her physical condition, he noted that Plaintiff walked

by "guarding [her] left leg," but that her gait and station were "[w]ithin normal limits," and that a

Romberg test[11] was negative.  (*Id.*)  Upon a physical examination, Dr. Nasir indicated that

Plaintiff's spine appeared "normal" with "non[-]tender" joints and no lower back pain.  (*Id.*, at

1065.)  He also noted that Plaintiff did not have tremors; that her upper extremity joints, lower

extremity joints, cervical spine, and lumbosacral spine all appeared "normal," but he assessed

lumbosacral radiculopathy and cervical radiculitis.  (*Id.*)  He further noted that Plaintiff was

taking various prescription medications.  (*Id.*, at 1063.)

      Based on Dr. Nasir's treatment records, Plaintiff continued to see him approximately

monthly through at least March 2015.  (*See id.*, at 946.)  In February 2012, Plaintiff reported that

she was falling easily, that she had numbness in her hands and feet, and that her anxiety had

increased.  (*Id.*, at 1031.)  In February 2013, Dr. Nasir reviewed results from an MRI of

Plaintiff's lumbar spine, noted that it revealed "[l]umbar disc disease with facet arthropathy,"

---

to the extent it sheds light on the [p]laintiff's condition as of the relevant time period"), *report
and recommendation adopted*, No. 1:12-CV-185, 2013 WL 1222008 (N.D.N.Y. Mar. 25, 2013)).

     [11] "The Romberg test is a test that measures your sense of balance."
https://www.healthline.com/health/romberg-test#who-gets-tested.

and, in addition to reiterating his assessments of lumbosacral radiculopathy and cervical radiculitis, he assessed Plaintiff with "syncope and collapse," and headache.  (*Id.*, at 1005-06.) Dr. Nasir's progress notes from June of 2013 also include assessments of "tremor" and "cerebral atherosclerosis."  (*Id.*, at 992.)  In May of 2014, Dr. Nasir noted that a "[t]ilt table test[12] was negative."  (*Id.*, at 962.)

Dr. Nasir's treatment notes through 2015 remained largely the same, except for occasional changes in Plaintiff's medications, including her psychiatric medications.   (*See id.*, at 955, 1001, 1026, 1030, 1036, 1051, 1059, 1060.)

Treatment notes available from February through May 2016 similarly indicate that Plaintiff consistently complained of migraines, left-side weakness and imbalance, paresthesia of the left lower extremity, low back pain numbness in the left leg, falling easily, bad anxiety, tremors, and poor sleep.  (*Id.*, at 2458-63.)

## 2.    Diagnostic Tests From Hudson Valley Imaging

Also added to the Record were reports of a number of MRIs taken at Hudson Valley Imagining ("HVI"),[13] including a brain MRI conducted on July 8, 2013, which, in comparison to a January 2013 MRI that was previously in the Record (*see id.*, at 787), was reported to reveal "[n]o change in the nonspecific white matter lesions adjacent to the left lateral ventricle[] [and] [n]o acute intracerebral pathology" (*id.*, at 1858).  An MRI of Plaintiff's left knee on August 19, 2013 yielded "unremarkable" findings, with "[n]o evidence of [a] meniscal tear."  (*Id.*, at 1859.)

---

[12] "A tilt table test is used to evaluate the cause of unexplained fainting." https://www.mayoclinic.org/tests-procedures/tilt-table-test/about/pac-20395124.

[13] The newly obtained HVI records also contained the report of an August 26, 2011 ultrasound examination of Plaintiff's "right upper quadrant" which revealed normal findings of the liver, gallbladder, kidney, pancreas, aorta, and inferior vena cava.  (R., at 1774.)

10

Another brain MRI, conducted on May 19, 2014, again revealed "[n]onspecific white matter hyperintensities," which was said to be "seen in the setting of migraine headaches." (*Id.*, at 1860.)

The HVI records further show that, on January 5, 2015, Plaintiff received MRIs of the cervical spine and lumbar spine. (*Id.*, at 1861-64.) The cervical-spine imaging showed "[d]egenerative changes C5-C6 and C6-C7 levels . . . . slightly more pronounced at the C5-C6 level when compared to the prior examination . . . . no intrinsic spinal cord abnormality." (*Id.*, at 1862.) The lumbar-spine imaging revealed "[n]o significant change when compared to the prior study from 1/28/2013." (*Id.*, at 1864; *see also id.*, at 786 (Jan. 28, 2013 study).) Another MRI of Plaintiff's cervical spine, performed on March 7, 2016 showed degenerative changes, but "no significant overall change when compared to prior," and a "[m]ild canal narrowing and mild right neural foraminal narrowing at C5-C6 without change from 01/05/2015." (*Id.*, at 1867.) Finally, an MRI of Plaintiff's lumbar spine, performed on March 8, 2016, showed degenerative changes, a "mild disc bulge," and a small central disc protrusion. (*Id.*, at 1868-69.)

### 3.      **Additional Records from St. Luke's Cornwall**

The Record initially contained records relating to Plaintiff's visits to St. Luke's Cornwall in 2011 and 2012, but later-obtained records show that Plaintiff was also admitted there on February 4, 2013 for "multiple episodes of dizziness and loss of consciousness." (R., at 1415.) The hospital notes indicate that Plaintiff had a "3 month history of recurrent episodes of loss of consciousness." (*Id.*, at 1420.) Plaintiff was given medication to manage anxiety, was advised to consider an outpatient sleep study and psychiatry treatment, and was sent for various neurological and cardiological tests. (*Id.*, at 1428.)

A "bilateral carotid doppler"[14] ultrasound conducted on February 4, 2013 revealed "no ultrasonic evidence of hemodynamically significant stenosis."[15]  (*Id.*, at 1429.)  A doppler echocardiogram performed on or about February 5, 2013 showed "trace tricuspid insufficiency," but otherwise normal findings.  (*Id.*, at 1432.)  An electroencephalogram from February 5, 2013 revealed normal findings.  (*Id.*, at 1433.)  A stress echocardiogram conducted in August 2013 was "[c]linically negative for myocardial ischemia."[16]  (*Id.*, at 1450-51.)

The hospital records also contain a report of an ultrasound conducted in January 2015, which revealed "no evidence of DVT in either leg."  (*Id*., at 1459.)

### 4.    Records From Cornerstone Family Healthcare

There are also new records from Cornerstone Family Healthcare ("Cornerstone"), where Plaintiff saw various providers for internal medicine care from 2014 through the end of the relevant period in June 2016.  (R., at 1910-2072.)  Notes from Plaintiff's visits there indicate that she had "[p]ermanent nerve damage" to the left side of her body from the back surgery that she had undergone in 2010.  (*Id.*, at 1910.)  The records also indicate that Plaintiff had dyslipidemia, depression, anemia, and vitamin D deficiency.  (*Id.*, at 1915-16.)  Plaintiff was treated at Cornerstone by Frank Morales, a nurse practitioner, for internal medicine, and Julie O'Connor, a certified midwife, for gynecological visits.  (*See id.*, at 1910-2072.)

---

[14] A Carotid ultrasound "uses sound waves to examine the blood flow through the carotid arteries" in the neck.  https://www.mayoclinic.org/tests-procedures/carotid-ultrasound/about/pac-20393399.

[15] Stenosis refers to a "narrowing of the spaces within your spine." https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961.

[16] "Myocardial ischemia occurs when blood flow to the heart muscle [] is obstructed by a partial or complete blockage of a coronary artery . . . ."  https://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/symptoms-causes/syc-20375417.

### 5.    Additional Records From the <u>Orange County Department of Mental Health</u>

The Record also contains additional treatment notes from the Orange County Department of Mental Health, for the relevant period.  (R., at 2383-88, 2530-83.)  Those records show that, on July 30, 2014, Plaintiff was found, upon a mental status exam, to have an evasive and guarded attitude; slow speech; an anxious, angry, and irritable mood; and average intellectual functioning; she was also found to have impairment of her remote memory and mild impairment of her ability to concentrate.  (*Id.*, at 2387.)  The newly obtained records further indicate that Plaintiff was seen multiple times per month for anxiety and depression from June 2014 through June 2016.  (*Id.*, at 2397-98, 2530-83.)

A note from September 3, 2014 reflects that Plaintiff was then "being seen for anxiety, depression, PTSD, [and a] personality disorder."  (*Id.*, at 2574.)  Martha Thomson, a nurse practitioner, noted that Plaintiff's speech and gait were "WNL" (presumably meaning "within normal limits"), that Plaintiff's affect was "appropriate," that her memory and attention were within normal limits, and that her judgment was "moderately impaired."  (*Id.*, at 2574-75.)  At a few of her later visits, Plaintiff's attention and concentration were noted as "mildly impaired."  (*Id.*, at 2565, 2569.)  In May of 2016, Plaintiff was offered a psychological evaluation, which she declined.  (*Id.*, at 2531.)

### 6.    <u>Additional Opinion Evidence</u>

Although the Court found that the ALJ had previously made insufficient efforts to obtain medical opinion evidence regarding Plaintiff's functional limitations from Dr. Nasir or any alternative treating source, the medical records that were added to the Record before the hearing on remand still contained a dearth of opinion evidence from Plaintiff's treaters.  In particular, the Record still contained no medical source statement or functional assessment from Dr. Nasir, or

from any of the several other physicians with whom Plaintiff had treated during the relevant

period.  Rather, the only opinion from a "treater" that was added to the Record was a brief note

from a nurse practitioner, Karen Feliciano ("Feliciano"), who apparently worked in Dr. Nasir's

office.  That note, which was dated October 30, 2019 (more than three years after Plaintiff's date

last insured), merely stated, with regard to Plaintiff:  "Permanently disabled.  She cannot work.

Intractable neck & lower back pain."  (R., at 2828.)

　　　The only other medical opinion evidence that was added to the Record was from

Dr. Steven Goldstein, a neurologist who neither examined nor treated Plaintiff, but who – as

described below – nonetheless testified as a medical expert at the hearing conducted by the ALJ

on remand.  (*See* R., at 2826, 2836-51.)

### E.　The Hearing on Remand

　　　Upon remand, ALJ Stacchini conducted a new hearing on November 15, 2019.  (R., at

2829-86 (the "2019 Hearing").)  Plaintiff was represented by counsel, Gary Gogerty, Esq., at the

2019 Hearing, and, at the outset of that hearing, the ALJ indicated that, as Plaintiff had a

"representative," he was "relying" on Gogerty to request medical source statements from both

Dr. Nasir and another doctor, Dr. Neal Dunkelman, with whom Plaintiff was then treating.[17]

(*See id.*, at 2834-35.)  Gogerty informed the ALJ that he had made requests to both doctors, but

that they had not responded.  (*See id*., at 2835.)  Gogerty added, though, that Plaintiff had

provided him, on that day, with a "note on the official New York State prescription of

Karen Feliciano who is a nurse practitioner at Dr. Nasir's office . . . stating that [Plaintiff] is

---

[17] At the 2019 Hearing, Plaintiff testified that she was then seeing Dr. Dunkelman for pain management.  (*See* R., at 2881.)  Indeed, from the supplemented Record, it appears that Plaintiff made several visits to Dr. Dunkelman for treatment (*see id.*, at 1775-1857, 2400-14, 2584-97, 2778-83), but it also appears that those visits all post-dated the period under review (*see id.*).

permanently disabled, and she cannot work, intervertebral neck and low back pain, signed by

Ms. Feliciano . . . ."  (*Id.*, at 2834-35.)

      The ALJ then took testimony from Dr. Goldstein, who testified that there was sufficient

evidence in the Record for him to form an opinion as to Plaintiff's medical condition.  (*Id.*, at

2837.)  The ALJ asked whether any "medically determinable impairments [had] been established

prior to June of 2016," and Dr. Goldstein responded:

> I believe the [R]ecord shows that [Plaintiff] has degenerative disc
> disease of both the cervical and lumbar spine.  I can see that she
> had surgery on her lumbar spine back in 2010.  She has been on
> chronic opioids all this time . . . . I can see that she has Factor V
> Leiden deficiency . . . . It's a deficiency that causes the blood to
> clot more than it should.  And she's had DVT, in other words,
> venous thrombosis, and she has had pulmonary ebolus.

(*Id.*, at 2838.)  Dr. Goldstein also testified that Plaintiff "ha[d] had syncopal episodes" and noted

that she also appeared to have had migraine headaches, but that he did not "see that it really

impaired her concentration abilities."  (*Id.*, at 2839.)

      Dr. Goldstein next testified that none of Plaintiff's impairments met or equaled any

listing, but that she did have functional limitations.  (*Id.*, at 2840.)  He stated that he thought "the

combination of her impairments would limit her to a sedentary level of activities," but that she

would be able to lift up to 10 pounds occasionally, stand or walk for up to two hours in an eight-

hour workday, and sit for up to six hours in an eight-hour workday.  (*Id.*, at 2841-42.)

Dr. Goldstein further opined that Plaintiff would not be able to climb ladders, ropes, or scaffolds,

and that she should avoid unprotected heights and hazardous machinery.  (*Id.*, at 2842.)  He also

testified that he did not see any evidence that Plaintiff's concentration was severely impaired.

(*Id.*)  The ALJ asked whether Plaintiff had "any limitations with regards to handling or fingering

or reaching" and Dr. Goldstein replied, "I think the carpal tunnel syndrome, but I think that was

later in the [R]ecord," presumably referring to records that post-dated Plaintiff's date last insured.  (*Id.*, at 2843.)  The ALJ noted that, prior to the date last insured, there were references to a "tremor," and asked if that would impose any further limitations on Plaintiff; in response, Dr. Goldstein replied, "I did not note that, Your Honor.  I missed that."  (*Id.*)  Dr. Goldstein testified that, overall, he had taken into account Plaintiff's obesity and syncopal episodes in forming his opinion.  (*Id.*)

Plaintiff then gave additional testimony on her own behalf.  She testified that she lived with her brother, age 29, and her sister, age 20, and that she had legal guardianship over her sister, who had special needs.  (*Id.*, at 2853.)  She testified that she had to take her sister "back and forth to counseling" and that, in order to do so, she would either drive or take a cab.  (*Id.*)  She testified that she would prepare meals with her brother, and that she did her own laundry, but that her brother did all the cleaning.  (*Id.*, at 2854.)  The ALJ asked Plaintiff whether she exercised, and she said that she lived in a "condo complex" that had a set of stairs, and that "[t]hat was the exercise."  (*Id.*, at 2855.)  Plaintiff also testified that she did not have any friends or acquaintances and had only limited contact with the remainder of her family.  (*Id.*)  With regard to any outdoor activities, Plaintiff testified that she had gone camping in the Adirondacks in 2012, but had not enjoyed it.  (*Id.*, at 2856.)

With respect to any efforts to engage in gainful employment, Plaintiff testified that she had tried going back to work twice, since 2010.  (*Id.*, at 2855.)  She explained that, the first time she tried to work at a school kitchen, she had "passed out . . . on the floor in front of about 50 kids."  (*Id.*, at 2856.)  She further explained that, the second time she tried to work was at a day care center, and she could not "handle that either because apparently [she] wasn't able to hear or stand too long with the children."  (*Id.*)

16

The ALJ then asked about Plaintiff's back pain and treatment she had had for it.  Plaintiff testified:

> I have done some rehab and things like that.  [] Dr. Dunkelman started having me come off the pain meds.  I went from four a day down to one.  And the pain had got so excruciating that I couldn't come off of them at all.  I wind up taking more Tylenol which is going to hurt my liver.

(*Id.*, at 2857-58.)  Plaintiff testified that she had syncopal episodes two or three times a month (*id.*, at 2859), that the DVT made her leg swell up and that she could not hike anymore or ride a bike (*id.*, at 2860), and that she had trouble in crowded places and could not "be around people too much" (*id.*, at 2861).  With regard to her mental impairments, Plaintiff testified that she could not "be in crowded rooms," that she could not "go into places," that she did not "touch things," that she could "not function in normal places anymore," and that she could not "walk out the door some days without freaking out." (*Id.*, at 2863.)  The ALJ asked if Plaintiff had any side effects from her medications and she stated, "[j]ust some weight gain" and sometimes an allergic reaction on her face.  (*Id.*, at 2864.)  She also testified, though, that she could not "sit, stand[,] or move around," that she could not "even pick a gallon or milk up half the time," and that she was "lucky if [she] [could] hold a cup of coffee without shaking."  (*Id.*, at 2870.)

Vocational expert ("VE") Beckie Hill also testified at the 2019 Hearing.  The ALJ asked the VE to assume a hypothetical person:

> of [Plaintiff's] age, education, and work experience, who is able to do the full range of sedentary work, lifting up to 10 pounds occasionally, and standing and walking for up to two hours, and sitting for up to six hours in an eight-hour workday with regularly scheduled breaks . . . [who was] limited to occasional climbing ramps and stairs, but no climbing ladders, ropes or scaffolds. Occasional balancing, stooping, kneeling, crouching, and crawling. [Who] should avoid unprotected heights and hazardous machinery, as well as concentrated exposure to atmospheric conditions . . . limited to understanding, remembering, and carrying out simple,

17

> routine tasks throughout the eight-hour workday . . . in a low-stress
> job that is defined as one that has decision-making and changes in
> work setting related to simple, routine tasks.

(*Id.*, at 2873.)  The ALJ asked whether jobs existed in the national economy that such a

hypothetical person would be able to perform.  (*Id.*)  The VE responded that such a person could

work as a "lens inserter," an "addresser," or a "document preparer."  (*Id.*, at 2873-74.)  The VE

also testified that the person would "still be able to perform those jobs if she [were] limited to the

frequent handling and fingering," and if she were "limited to occasional interaction with the

general public, coworkers, and supervisors."  (*Id.*, at 2874.)  The VE stated, though, that if the

person were further limited such that they were off-task for 20 percent of the workday, if the

person were to miss two days of work per month, if the person were limited to four hours of

sitting and only one hour of standing and/or walking in an eight-hour workday, or if the person

could not independently perform simple tasks, then that would preclude full-time work.  (*Id.*, at

2874-75.)

On January 24, 2020, the ALJ again issued a decision finding that Plaintiff was not

disabled.  (*Id.*, at 1070-86 (the "2020 ALJ Decision").)  Plaintiff appealed again, and the matter

is now before this Court.

### F.     The Current Action and Motions Before the Court

Represented by counsel, Plaintiff filed the Complaint in this action on April 16, 2020.

(Dkt. 1.)

On February 1, 2021, Plaintiff filed a motion for judgment on the pleadings, seeking

reversal of the Commissioner's decision.  (Dkt. 16 (Notice of Motion).)  In the memorandum of

law accompanying her motion, Plaintiff first argued that, in his decision on remand, the ALJ

violated the treating physician rule by crediting the opinion of the non-examining medical expert,

Dr. Goldstein, over the opinion expressed in the note provided by Feliciano, the nurse practitioner from Dr. Nasir's office.  (*See generally* Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Administrative Record and Pleadings Pursuant to Rule 12(c) F.R.C.P., dated Feb. 1, 2021 ("Pl. Mem.") (Dkt. 17), at 14-18.)  Plaintiff further argued that, if Feliciano's note was insufficiently clear, then the ALJ should have sought to develop the record by requesting clarification, prior to rejecting Feliciano's opinion wholesale. (*See id.*, at 15-16.)  Plaintiff also argued that the ALJ's assessment of Plaintiff's RFC was, once again, not supported by sufficient evidence (*see generally id.*, at 18-22), and that the ALJ erred by failing to make a proper evaluation of Plaintiff's subjective complaints of pain (*see generally id.*, at 22-25).

On June 16, 2021, Defendant opposed Plaintiff's motion and filed a cross-motion for judgment on the pleadings in favor of the Commissioner (Dkt. 23 (Notice of Cross-Motion)), supported by a memorandum of law (Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, undated ("Def. Opp. Mem.") (Dkt. 24)).  Defendant contended that substantial evidence supported the Commissioner's decision that Plaintiff was not disabled, that the ALJ had reasonably evaluated the medical opinion evidence in the Record, that the RFC finding was supported by substantial evidence, and that the ALJ had properly evaluated Plaintiff's subjective complaints.  (*See generally id.*)

Plaintiff filed a reply brief on July 7, 2021.  (*See* Plaintiff's Reply Memorandum of Law in Opposition to Defendant's Cross-Motion and In Further Support of Plaintiff's Motion for Judgment on the Administrative Record and Pleadings Pursuant to Rule 12(c) F.R.C.P., dated July 7, 2021 ("Pl. Reply.") (Dkt. 25).)  On reply, Plaintiff reiterated many of the arguments raised in her moving brief, but also stressed that, despite the Court's earlier rulings, the ALJ had

still failed to comply with his obligation to seek a physical medical source statement from one of

Plaintiff's treating sources, which, itself, constituted a failure to develop the record.  (*See id.*, at

ECF 2-3.)

## DISCUSSION

### I.  APPLICABLE LEGAL STANDARDS

#### A.  Judgment on the Pleadings

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes

'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC),

2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*,

901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by

considering the contents of the pleadings,'" *id*. (quoting *Sellers v. M.C. Floor Crafters, Inc.*,

842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's

decision is final, provided that the correct legal standards are applied and findings of fact are

supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131

(2d Cir. 2000).

#### B.  The Five-Step Sequential Evaluation

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in

the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R.

§ 404.1520; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).

The first step of the inquiry requires the ALJ to determine whether the claimant is

engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  If not, at the second step,

the ALJ determines whether the claimant has a "severe" impairment or combination of

impairments that significantly limits his or her physical or mental ability to do basic work

activities.  *Id.* § 404.1520(a)(4)(ii), (c).  If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  *Id.* § 404.1520(a)(4)(iii).  If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience."  *Id.* § 404.1520(d).

Where the claimant alleges a mental impairment, Steps Two and Three require the ALJ to apply a "special technique," outlined in 20 C.F.R. § 416.920a, to determine the severity of the claimant's impairment at Step Two, and to determine whether the impairment satisfies Social Security regulations at Step Three.[18]  *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's RFC, or ability to perform physical and mental work activities on a sustained basis.  *Id.* § 404.1545.  The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work."  *Id.* § 404.1520(a)(4)(iv).  Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy.  *Id.* § 404.1520(a)(4)(v), (g).

---

[18] Pursuant to 81 Fed. Reg. 66138-01 (S.S.A. Sept. 26, 2016), the SSA revised the criteria in the Listing of Impairments (the "Listing," 20 C.F.R. Pt. 404, Subpt. P, App. 1) used to evaluate claims involving mental disorders under Titles II and XVI of the Act, effective January 17, 2017.  These revisions impacted various relevant portions of 20 C.F.R. §§ 404 and 416; *see Brothers v. Colvin*, No. 7:16cv100 (MAD), 2017 WL 530525, at *4 n.2 (N.D.N.Y. Feb. 9, 2017).

C.    **Duty To Develop the Record**

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *accord Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 262 (S.D.N.Y. 2016) (noting that "[r]emand is appropriate where this duty is not discharged").  Indeed, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel.'"  *Rosa*, 168 F.3d at 79 (quoting *Perez*, 77 F.3d at 47).  The ALJ also has the authority to subpoena medical evidence on behalf of the claimant, 42 U.S.C. § 405(d), but is not required to subpoena medical records if they are not received following two ordinary requests, *Gonell De Abreu v. Colvin*, No. 16cv4892 (BMC), 2017 WL 1843103, at *5 (E.D.N.Y. May 2, 2017); 20 C.F.R. § 404.950(d)(1).

The question of "[w]hether the ALJ has met his duty to develop the record is a threshold question.  Before reviewing whether the Commissioner's final decision is supported by substantial evidence . . . the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record."  *Craig*, 218 F. Supp. 3d at 261-62 (internal quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g).  Further, the court must satisfy itself that the administrative record has been adequately developed, regardless of whether the issue is raised by the plaintiff.  *See Castillo v. Comm'r of Soc. Sec.*, No. 17cv09953 (JGK) (KHP), 2019 WL 642765, at *7 (S.D.N.Y. Feb. 15, 2019).

### D.      **The Treating Physician Rule**

Under the so-called "treating physician rule," which, as noted above, was in effect at the time of Plaintiff's application here (*see supra*, at n. 9), the medical opinion of a treating source as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  A "treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her.  *Id.* § 404.1502.  Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  *Id.* § 404.1527(c)(2); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004) (summary order).

Where an ALJ determines that a treating physician's opinion is not entitled to "controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion.  20 C.F.R. § 404.1527(c)(2).   Failure to "give good reasons" is grounds for remand.  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of a treating physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS),

2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing 20 C.F.R. § 404.1527(d)(2)[19]),

including:  (1) the length of the treatment relationship and the frequency of  examination; (2) the

nature and extent of the treatment relationship, including whether the  treatment received was

particular to the claimant's impairment; (3) the supportability of the  physician's opinion; (4) the

consistency of the physician's opinion with the record as a whole;  and (5) the specialization of

the physician providing the opinion, 20 C.F.R. §§ 404.1527(c)(2)-(5); *see* Shaw, 221 F.3d at 134

(noting that these five factors "must be considered when the treating physician's opinion is not

given controlling weight").

Even where a treating physician's opinion is not entitled to "controlling weight," it is

generally entitled to "more weight" than the opinions of non-treating and non-examining

sources.  20 C.F.R. § 404.1527(c)(2); *see* SSR 96-2p (S.S.A. July 2, 1996) ("In many cases, a

treating source's medical opinion will be entitled to the greatest weight and should be adopted,

even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F.

Supp. 2d 580, 589 (S.D.N.Y. 2000).  A consultative physician's opinion, by contrast, is

generally entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009)

(summary order) (internal quotation marks and citation omitted).  This is because consultative

examinations "are often brief, are generally performed without benefit or review of the

claimant's medical history, and, at best, only give a glimpse of the claimant on a single day."

*Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and

citations omitted).  The opinions of consultative physicians, though, "can constitute substantial

evidence in support of the ALJ's decision" when the opinion of a claimant's treating physician

---

[19] On February 23, 2012, the Commissioner amended 20 C.F.R. §§ 404.1527, by, among other things, removing paragraph (c), and re-designating paragraphs (d) through (f) as paragraphs (c) through (e).

cannot be obtained.  *Sanchez v. Commissioner of Social Sec.*, No. 15cv4914, 2016 WL

8469779, at *10 (S.D.N.Y. Aug. 2, 2016), *report and recommendation adopted by* 2017 WL

979056 (Mar. 13, 2017).

### E.    Assessment of a Claimant's Subjective Complaints

Assessment of a claimant's subjective complaints about his or her symptoms or the effect

of those symptoms on the claimant's ability to work involves a two-step process.  Where a

claimant complains that certain symptoms, including pain, limit his or her capacity to work, the

ALJ is required, first, to determine whether the claimant suffers from a "medically determinable

impairment that could reasonably be expected to produce" the symptoms alleged.  20 C.F.R.

§ 404.1529(c)(1).  Assuming the ALJ finds such an impairment, then the ALJ must take the

second step of "evaluat[ing] the intensity and persistence of [the claimant's] symptoms,

including pain," considering "all of the available evidence," to determine "how [the] symptoms

limit [the claimant's] capacity for work."  *Id.* § 404.1529(c)(1).  In doing so, the ALJ must

consider all of the available evidence, and must not "reject [ ] statements about the intensity and

persistence of [ ] pain or other symptoms . . . solely because the available objective medical

evidence does not substantiate [the claimant's] statements."  *Id.* § 404.1529(c)(2).  Instead,

where the claimant's contentions regarding his or her symptoms are not substantiated by the

objective medical evidence, the ALJ must evaluate the claimant's statements in relation to the

objective evidence and other evidence, in order to determine the extent to which the claimant's

symptoms affect his or her ability to do basic work activities.  *Id.* § 404.1529(c)(3)-(4); *see also*

SSR 16-3p.[20]

---

[20] Effective on March 28, 2016, SSR 16-3p superseded SSR 96-7p, which had required
the ALJ to make a finding on the credibility of the claimant's statements about the intensity,
persistence, or functionally limiting effects of pain or other symptoms, where those statements

While an ALJ "is required to take [a] claimant's reports of pain and other limitations into account" in evaluating his or her statements, an ALJ is "not required to accept the claimant's subjective complaints without question." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  To the extent the ALJ determines that the claimant's statements are not supported by the medical record, however, the ALJ's decision must include "specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence," and the reasons must be "clearly articulated" for a subsequent reviewer to assess how the adjudicator evaluated the individual's symptoms.  SSR 16-3p.  The factors that an ALJ should consider in evaluating the claimant's subjective complaints, where they are not supported by objective medical evidence alone, are:  (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms.  *See* 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

---

are not substantiated by objective medical evidence.  *See* SSR 96-7p (S.S.A. July 2, 1996).  The new ruling, SSR 16-3p, eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p (S.S.A. Mar. 28, 2016).  Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms."  *Id.* Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings.  *Compare* SSR 96-7p, *with* SSR 16-3p.

## II.   **THE 2020 ALJ DECISION**

The decision of ALJ Stacchini that is now under review by this Court was issued on

January 24, 2020.  (*See* R., at 1086.)  In rendering his decision that Plaintiff was not disabled for

purposes of the Act and did not qualify for disability insurance benefits, the ALJ applied the

five-step sequential evaluation.

At Step One, the ALJ determined that Plaintiff "did not engage in substantial gainful

activity during the period from her alleged onset date of July 21, 2010 through her date last

insured of June 30, 2016."  (*Id.*, at 1073.)

At Step Two, the ALJ determined that Plaintiff had the severe impairments of

"degenerative disc disease of the cervical and lumbar spine; migraine headaches; sinusitis; a

depressive disorder; an anxiety disorder; a post-traumatic stress disorder (PTSD); a borderline

personality disorder; hammertoe; deep vein thrombosis; cellulitis; obesity[;] and[] cerebral

atherosclerosis" (*id.*) – impairments that "significantly limit the ability to perform basic work

activities" (*id.*).  The ALJ further noted that there was evidence in the Record that Plaintiff had

anemia and gallstones, but that both conditions were "non-severe" impairments.  (*Id.*)

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of a listed impairment.  (*Id.*)

Although, in his 2015 decision, the ALJ had found Plaintiff capable of performing light

work, with certain restrictions (*see id.*, at 1110), this time the ALJ found that Plaintiff had the

RFC to

> perform sedentary work as defined in 20 C.F.R. § 404.1567(a)
> except [that] she could occasionally lift/carry 10 pounds; sit up to
> six hours and stand/walk up to two hours each [day] with regularly
> scheduled breaks.  She could occasionally climb ramps and stairs,
> but never climb ladders, ropes or scaffolds.  She could occasionally
> balance, stoop, kneel, crouch, or crawl.  She [must] avoid

> unprotected heights and hazardous machinery; and, concentrated
> exposure to atmospheric conditions.  She [is] able to understand,
> remember and carry[]out simple and routine tasks throughout and
> eight-hour work day with regularly scheduled breaks in a low
> stress job defined as one having changes in work setting and
> decision[-]making related to simple and routine tasks.

(*Id.*, at 1076.)

In making his RFC determination, the ALJ referenced and summarized portions of

Plaintiff's testimony at the 2019 Hearing, concluding that, while her medically determinable

impairments could have reasonably been expected to cause her alleged symptoms, Plaintiff's

statements concerning the intensity, persistence, and limiting effects of those symptoms were not

entirely consistent with the evidence in the record.  (*Id.*, at 1077.)  The ALJ took notice of his

prior decision and incorporated by reference the summary of the medical evidence in that

decision, as well as the summary of the medical evidence in Judge Aaron's 2018 Report and

Recommendation.  (*Id.*)  The ALJ also outlined the new medical evidence that he considered in

rendering his RFC determination.  (*Id.*, at 1077-84.)  The ALJ stated that "neither [he] nor

[Plaintiff's] representative" had been able to obtain a medical source statement from Dr. Nasir

regarding Plaintiff's RFC, but that Feliciano had written a letter stating that Plaintiff was

permanently disabled and could not work due to intractable neck and lower back pain.  (*Id.*, at

1078.)

In considering the available medical opinion evidence in connection with making his

RFC determination, the ALJ somewhat confusing assigned both "some weight" and "great

weight" to the opinion of the consulting neurologist, Dr. Puri (*id.*, at 1082-83), seemingly finding

that opinion to have been consistent with the doctor's findings upon examination and Plaintiff's

statements regarding her activities; he assigned "little weight" to the opinion of the consulting

psychologist, Dr. Gindes, as purportedly "poorly supported and inconsistent with the substantial

28

evidence in the record" (*id.*, at 1083); and he assigned "some weight" to the opinion of the

non-examining consultant, Dr. Hoffman, as "consistent with the medical records showing stable

[mental] symptoms and stable mental status examinations with conservative treatment . . ." (*id.*).

As for the newly obtained opinions in the Record the ALJ gave "little weight" to

Feliciano's opinion that Plaintiff could not work, finding that brief opinion to have been "vague

and not well supported by the evidence during the period at issue," as well as inconsistent with

what the ALJ described as "the well[-]supported opinion of Dr. Goldstein." (*Id.*, at 1084.)  In

contrast, the ALJ assigned "great weight" to the opinions testified to by Dr. Goldstein at the 2019

Hearing, finding those opinions to have been "consistent with [Plaintiff's] course of

treatment . . . as well as diagnostic findings . . . ." (*Id.*)

At Step Four, the ALJ determined that Plaintiff had "no past relevant work." (*Id.*)

Finally, at Step Five, the ALJ concluded that, considering Plaintiff's age, education, work

experience, and RFC, there were jobs that existed in significant numbers in the national economy

that Plaintiff could have performed during the period at issue.  (*Id.*)

III.   **REVIEW OF THE 2020 ALJ DECISION**

    A.   **The Weight Assigned by the ALJ to the Newly**
        **Obtained Opinions of Feliciano and Dr. Goldstein Did**
        **Not, Standing Alone, Violate the Treating Physician Rule.**

The first argument now raised by Plaintiff in her motion for judgment on the pleadings is

that the ALJ failed to comply with the treating physician rule by assigning greater weight to the

medical opinion of the non-examining medical expert, Dr. Goldstein, than to the opinion of

Feliciano, the nurse practitioner from Dr. Nasir's office.  (*See* Pl. Mem., at 12-18.)  This

argument, in and of itself, is not persuasive for a number of reasons.

For one thing, the ALJ was justified in according only little weight to Feliciano's opinion, as it not only contained no functional assessment of Plaintiff's capabilities, but it was provided more than three years past the date when Plaintiff was last insured, and did not, on its face, speak to Plaintiff's impairments during the relevant period. *See Vitale v. Apfel*, 49 F. Supp. 2d 137, 142 (E.D.N.Y. 1999) (noting that "the existence of a pre-existing disability can be proven by a retrospective opinion" only if such opinion "refer[s] clearly to the relevant period of disability and [does] not simply express an opinion as to the claimant's current status").

Moreover, although Plaintiff has seemingly tried to suggest that, because Feliciano "was from Dr. Nasir's office" (Pl. Mem., at 14), Feliciano's opinion should be deemed an adequate substitute for an opinion of Dr. Nasir, the treating physician rule only requires that "controlling weight" be given to the opinion of a qualified treating source – not to someone "from" such a treater's "office." Indeed, for a medical opinion to be entitled to the deference afforded by the treating physician rule, that opinion must have been offered by a provider shown to have had a direct, personal, and longitudinal treatment relationship with the plaintiff. *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) (finding it insufficient that the two doctors who provided opinions had worked in the same facility where plaintiff had repeatedly been seen, where neither of those doctors had demonstrated the necessary, longstanding physician/patient relationship).

In any event, as of the time when Plaintiff filed her application for benefits, a nurse practitioner was not considered a "treating source" for purposes of the treating physician rule, even where he or she had treated the plaintiff for an extended time. *See, e.g.*, *Price v. Comm'r of Soc. Sec.*, No. 19cv8499 (JPO), 2021 WL 1222139, at *3 (S.D.N.Y. Mar. 31, 2021) (citing cases); *see also Cherry v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 658, 661 (2d Cir. 2020)

(Summary Order) (explaining that, while the applicable regulations were amended in 2017 "to add advanced practice registered nurses (a category that includes nurse practitioners) to the list of acceptable medical sources, [] the amended regulation applies only to claims filed on or after March 27, 2017 . . . ." (citing 20 C.F.R. 404.1502(a)(7))).

In addition, Plaintiff's contention that Dr. Goldstein's opinion was "not well supported" (Pl. Mem., at 16) and thus, presumably, not entitled to "great weight," is misguided.  On this point, Plaintiff primarily argues that, when Dr. Goldstein's testimony initially reflected a lack of certainty as to whether Plaintiff was capable of performing sedentary work, the ALJ, "unsatisfied" with that testimony, improperly "led the doctor to testify as the ALJ wished."  (*Id*.) Yet, an ALJ is not prohibited from asking leading questions at a hearing, as long as the questions do not "demonstrate bias or a prejudicial tone."  *See, e.g., Torres v. Comm'r of Soc. Sec.*, No. 20cv2612 (GWG), 2021 WL 4159542, at *11 (S.D.N.Y. Sept. 14, 2021); *McDonagh v. Acting Comm'r of Soc. Sec.*, No. 16cv08698 (VSB) (KHP), 2017 WL 9286987, at *16 (S.D.N.Y. Nov. 27, 2017), *report and recommendation adopted*, 2018 WL 2089340 (S.D.N.Y. May 2, 2018).  Here, a fair reading of the transcript of the 2019 Hearing suggests that, by asking leading questions, the ALJ was merely attempting to clarify what Dr. Goldstein meant when he testified that he "would not be surprised if [Plaintiff was] less than sedentary . . . [b]ut on the outset of the medical impairments, [he thought] she [could] function at a sedentary level."  (R., at 2841.)  This Court perceives no bias or other impropriety in the ALJ's questioning, and finds or error in the ALJ's decision to weigh Dr. Goldstein's testimony heavily in formulating Plaintiff's RFC.[21]

---

[21] For the same reason, this Court finds that it was not error, *per se*, for the ALJ to have relied on Dr. Goldstein's opinion as "substantial evidence" supporting the ALJ's RFC determination.  (*See* Pl. Mem., at 18-20 (arguing that, because Dr. Goldstein's testimony was elicited by the ALJ through leading questions, it was insufficient to support the RFC assessment).)

For all of these reasons, I recommend that the Court reject Plaintiff's first argument and find that, in the ALJ's weighing of the opinions of Feliciano and Dr. Goldstein, the ALJ did not violate the treating physician rule.

### B.  The ALJ Did Err, However, by Failing To Take Sufficient Steps To Develop the Record, as He Was Specifically Directed To Do.

Although, as discussed above, Plaintiff's first argument is unavailing, this does not mean that the ALJ's decision on remand was free from legal error.  The principal issue that stands out here as problematic is not the issue raised in Plaintiff's moving brief, but rather the corollary one she emphasizes on reply – that, despite the Court's prior, explicit direction, the ALJ still failed to develop the Record, in that he failed to make any direct outreach to Dr. Nasir (or, alternatively, to another of Plaintiff's treaters who would have qualified as a "treating source" under the treating physician rule) to try to obtain a functional assessment of Plaintiff's limitations, and that, instead, he impermissibly sought to delegate his duty to develop the Record to Plaintiff's counsel.  (*See* Pl. Mem., at ECF 2-3 (pointing out that the ALJ was directed, on remand, to obtain opinion evidence from a treating source, and arguing that "it is the duty of the ALJ to develop the record, even when the Claimant is represented by counsel").)[22]

In his 2018 Report and Recommendation, which provided the basis for the Court's earlier remand Order, Judge Aaron found that, while "the ALJ took multiple steps to obtain medical records from . . . Dr. Nasir," he "never sought Dr. Nasir's opinion with respect to whether [Plaintiff was] disabled."  (R., at 1149.)  Judge Aaron further found that, even if Dr. Nasir had

---

[22] Even though a court may disregard arguments raised for the first time on reply, the court "enjoys broad discretion" to consider such arguments, *Compania Del Bajo Caroni (Caromin), C.A. v. Bolivarian Rep. of Venez.*, 341 F. App'x 722, 724 (2d Cir. 2009 (summary order) (citing *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005)), and here – where the point was central the Court's last remand Order – this Court finds it appropriate to reach the issue.

refused to provide a medical opinion, "the ALJ could have sought a functional capacity assessment from an alternative source." (*Id.*, at 1150.)  The Court determined that it was error for the ALJ to have failed to seek medical opinion evidence from Plaintiff's treaters (with respect to both her physical and mental functional capacities), and directed the ALJ, upon remand, to address the clear gap in the Record by seeking such evidence.  (*See id.*, at 1151-52.)

In his 2020 decision, the ALJ acknowledged that he had been directed by the Court to take steps to obtain a functional assessment from a treating source, noting:  "Specifically, I was directed to obtain opinion evidence or a residual functional assessment from the claimant's treating physician, Dr. Nasir or an alternative source." (*Id.*, at 1070.)   The ALJ then went on to state that "neither our office nor the claimant's representative were able to obtain a medical source statement from Dr. Nasir or an alternative treating source aside from the nurse practitioner's statement." (*Id.*)  It is difficult, though, for this Court to credit the ALJ's implicit representation that "his office" had, in fact, made efforts to obtain such evidence, as there is *no* documentary evidence in the Record that the ALJ, or anyone from the SSA, took any steps at all, in response to the Court's ruling, to make any direct solicitation of a medical source statement from either Dr. Nasir or any of Plaintiff's other treaters.  Rather, it appears that the ALJ chose to leave the matter entirely in the hands of Plaintiff's counsel.

Indeed, the transcript of the 2019 Hearing records the following colloquy between the ALJ and Plaintiff's counsel:

> ALJ:   Now, you were going to – I know you had stated on the last
> date that you had sent out requests for medical source
> statements from Dr. Nasir, Dr. Dunkelman.
>
> ATTY:  Yes.
>
> ALJ:   And the orthopedic.  You were –

ATTY:   They did not respond.

ALJ:   . . . okay.  Do I have all of the evidence?

ATTY:   You do, Your Honor . . . .

. . .

ALJ:   I'll let you file [the note from Feliciano] because . . . you
have told me or you represented that you have sent out
requests for medical source statements from all the
providers.

ATTY:   That's correct, Your Honor.

ALJ:   And you have followed up – your office has followed up on
them as well, correct?

ATTY:   Absolutely, Your Honor.

ALJ:   All right.  Yeah.  Typically on the remand, you know, I was
directed to at least request that information from the
doctors I wrote, you know, since she has a representative,
I am relying on you to send out the requests.  You have sent
out the requests.

ATTY:   I have.

. . .

ALJ:   Okay.  . . . I can't subpoena them to make them provide a
medical source statement.

ATTY:   Understood.

ALJ:   . . . I had asked you to ask for them, you know, I got [the]
response that I got . . . .

(*Id.*, at 2834-35.)

While it is true that an ALJ may "seek the assistance of Plaintiff's counsel" in obtaining

records, "an ALJ cannot merely rely on requests of counsel to obtain records to fulfill the duty to

investigate and develop the record."  *Carr v. Comm'r of Soc. Sec.*, No. 16cv5877 (VSB), 2018

WL 3410012, at *3 (S.D.N.Y. July 12, 2018); *see also Williams v. Comm'r of Soc. Sec.*, No.

1:17-CV-01322 EAW, 2019 WL 851065, at *5 (W.D.N.Y. Feb. 21, 2019) ("The ALJ has a duty

independent of Plaintiff's counsel to investigate and develop the record, and the ALJ does not

satisfy that duty merely by relying on Plaintiff's counsel to obtain missing evidence.")  Further,

by commenting on the record of the 2019 Hearing that he had no ability to "subpoena" a medical

source statement from a treating physician, the ALJ seems to have missed the point made out by

Judge Aaron:  that even if "it was difficult to get Dr. Nasir's office to comply with the subpoena

for medical records, . . . it does not necessarily follow that Dr. Nasir would have refused to

provide an opinion report or complete a questionnaire." (R., at 1150.)   In other words,

regardless of whether the ALJ could have served Dr. Nasir with a subpoena for a medical source

statement, he could – and should – have at least attempted to make a direct request to Dr. Nasir

(or an alternative treating source) for a completed questionnaire regarding Plaintiff's functional

abilities and limitations, and his failure to do so upon remand was just as much error as it was the

first time around.

        In short, upon remand, the ALJ should have sent Dr. Nasir a request for a functional

assessment, and, if Dr. Nasir failed to provide one, then the ALJ should have requested one from

another of Plaintiff's physicians who had a longstanding treatment relationship with her during

the period under review.  For example, the ALJ could have sought a medical source statement

from Dr. Polepalle, who treated Plaintiff repeatedly for pain management during the relevant

period, or the ALJ could have requested opinion evidence from another doctor whom Plaintiff

saw regularly during that time for her various physical conditions – such as Dr. Jack McNulty,

the neurosurgeon who performed Plaintiff's back surgery and who saw her five times during the

relevant period, [23] or Dr. Steven Jacobs, another neurosurgeon who also saw Plaintiff five times

during that period; or, perhaps, a physician from GHV, where Plaintiff received general medical

care.  Further, although Plaintiff's motion emphasizes her allegedly disabling physical

conditions, the Court previously noted – and this Court again stresses – that the Record reveals a

lack of opinion evidence, from any of Plaintiff's treaters, with respect to both her physical *and*

mental functional capacities.  For purposes of filling in the gap in the Record regarding

Plaintiff's mental capacities, the ALJ should have sought a functional assessment from a

physician or other acceptable medical source who provided Plaintiff with mental-health care,

such as a physician from the Orange County Department of Mental Health, which she visited

regularly during the period at issue.

As this Court cannot find that the ALJ satisfied his non-delegable obligation to develop

the Record to seek such functional assessments from one or more of Plaintiff's treating

physicians, I recommend that this case be remanded for a second time.  I further recommend

that, upon remand, the ALJ be instructed to make *direct* efforts to obtain both physical and

mental functional assessments from one or more of Plaintiff's qualified treating sources

(meaning physicians or other providers whose opinions would ordinarily be entitled to

"controlling weight" under the treating physician rule) who treated her during the relevant

period.  Further, as the critical question here is whether Plaintiff became disabled before her date

last insured, *see Stone v. Comm'r of Soc. Sec.*, No. 17cv569 (RJS) (KNF), 2018 WL 1581993, at

---

[23] While there is "no minimum number of visits required to establish a treating physician
relationship," *Parker v. Comm'r of Soc. Sec. Admin.*, No. 18cv3814 (PAE) (HBP), 2019 WL
4386050, at *4 (S.D.N.Y. Sept. 13, 2019), courts have held that five visits is sufficient, *see, e.g.,
Maldonado v. Berryhill*, No. 16cv165 (JLC), 2017 WL 946329, at *6 (S.D.N.Y. Mar. 10, 2017)
(referring to a doctor who examined plaintiff five times as a "treating physician"); *Bailey v.
Astrue*, 815 F. Supp. 2d 590, 598 (E.D.N.Y. Sept. 27, 2011) (rheumatologist who examined
plaintiff "at least five times" was treating physician).

*4 (S.D.N.Y. Mar. 27, 2018), the ALJ should also be directed to request that the treaters' opinions address Plaintiff's condition(s) during the relevant period, as opposed to only at the current time. Finally, I recommend that, if the ALJ is able to secure medical opinion evidence from one or more of Plaintiff's treaters who qualify as treating sources for purposes of the treating physician rule, then he give appropriate weight to such opinion(s), and reassess Plaintiff's RFC as may be necessary in light of the additional evidence.

### C.    Additional Issues That Should Be Addressed Upon a Further Remand

Plaintiff raises two other issues that warrant the Court's consideration. The first relates to the question of whether the environmental restriction incorporated by the ALJ into Plaintiff's RFC was supported by medical evidence in the Record, and the second relates to whether the ALJ properly evaluated Plaintiff's subjective complaints of pain. As set forth below, this Court finds that both of these issues should be further addressed by the ALJ, upon remand.

### 1.    Extent of Plaintiff's Need To Avoid Atmospheric Conditions

Plaintiff contends that there was no support in the Record for the ALJ's determination, as part of his RFC assessment, that (presumably because of her sinusitis) Plaintiff needed to avoid "concentrated" exposure to atmospheric conditions; on this subject, Plaintiff points out that the only medical professional who provided an opinion on the issue, Dr. Hoffman, had actually opined that Plaintiff should "avoid even moderate exposure" to fumes, odors, dusts, gases, and poor ventilation. (*See* Pl. Mem., at 20-22.) As Plaintiff notes, there is a range of environmental restrictions that may apply to a particular claimant, and anything between a limitation to "very little" exposure to atmospheric conditions (at one end of the spectrum) to "excessive" exposure (at the other end) will "generally require consultation of occupational reference materials or the services of a [vocational specialist]." (*Id.*, at 21 (citing SSR 85-15).)

At the 2019 Hearing, the ALJ failed to ask the VE to opine regarding the availability of work for a hypothetical person with the level of environmental restriction specified by Dr. Hoffman, which was within the range where, under the applicable regulation, the ALJ should have sought the VE's assistance.  (*See* R., at 2873 (ALJ asking the VE to testify only about the availability of work for a person restricted to avoiding "concentrated exposure to atmospheric conditions," which was a lesser restriction than that specified in Dr. Hoffman's medical opinion). This failure by the ALJ could have impacted the VE's testimony (and hence the ALJ's ultimate disability determination), as a person who cannot tolerate "even moderate exposure" to atmospheric conditions will likely be excluded from more workplace environments than a person who is only unable to tolerate more extreme conditions (which will be found in fewer workplaces).

Further, to the extent the ALJ substituted his own lay opinion for that of a medical professional with respect to the degree of any restriction included in Plaintiff's RFC, the ALJ committed error in that regard.  *See, e.g.*, *Merriman v. Comm'r of Soc. Sec.*, No. 14cv3510 (PGG) (HBP), 2015 WL 5472934, at *18 (S.D.N.Y. Sept. 17, 2015), *adopting report and recommendation* ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." (citation omitted)).

Thus, on remand, the ALJ should be directed to ensure that every portion of his RFC assessment is supported by medical evidence in the Record, and to recall the VE, if necessary to assist in determining if jobs would have been available, during the relevant period, to a person with Plaintiff's RFC.

## 2.    Evaluation of Plaintiff's Subjective Complaints of Pain

Finally, Plaintiff contends that the ALJ failed to engage in a proper evaluation of Plaintiff's subjective complaints of pain.  (*See* Pl. Mem., at 22-25).  In this regard, Plaintiff argues that, while the ALJ set out the factors relevant to evaluating Plaintiff's subjective complaints, he "fail[ed] to fully explain how the factors [were] applied to the evidence," rendering his evaluation "largely conclusory."  (*Id.*, at 23.)  Plaintiff further argues that, in considering whether Plaintiff's complaints of pain were adequately supported by objective medical evidence, the ALJ engaged in "cherry picking" – *i.e.,* he improperly highlighted the evidence that tended to call Plaintiff's testimony into question, while disregarding or minimizing the evidence that would have lent support to her claims of disabling limitations.  (*See id.*, at 24-25.)

As a general matter, this Court does not agree with Plaintiff that the ALJ's assessment of her subjective complaints of pain was overly conclusory.  To the contrary, the ALJ gave a reasoned explanation as to why he found that the limiting effects of Plaintiff's physical and mental conditions were not as incapacitating as Plaintiff claimed.  Plaintiff's argument about the ALJ's "cherry picking" the evidence, however, is of somewhat greater concern.  It is not that the ALJ neglected to mention evidence in the Record that would have supported Plaintiff's subjective complaints; indeed, he summarized numerous medical records, including those that had been obtained from Dr. Nasir subsequent to the 2014 Hearing, that would have provided a foundation for Plaintiff's complaints of disabling pain.  (*See, e.g.*, R., at 1077-78 (noting, *inter alia*, that Dr. Nasir had "assessed lumbrosacral radiculopathy and cervical radiculitis with cervicogenic headache"; that he had "prescribed Vicodin for cervical radiculitis"; that he had prescribed a "TENS" (transcutaneous electrical nerve stimulation) unit for pain; and that an MRI

of Plaintiff's brain showed "white matter disease"[24]); *see also id.*, at 1078-80 (summarizing records that showed, *inter alia*, abnormal spine MRIs; a history of episodes of syncope; an MRI consistent with migraines; electrodiagnostic studies consistent with radiculopathy; and psychiatric diagnoses that included panic disorder.)  In finding, however, that Plaintiff was not as limited as she alleged, the ALJ highlighted only isolated and seemingly date-specific portions of the medical record that he had summarized.

For example, as a basis to explain why Plaintiff's migraines were not debilitating, the ALJ stated that "treatment records from July and August 2010 note[d] that [Plaintiff's] migraine headaches were controlled with [medication]."  (*Id.*, at 1080.)  Yet, as the ALJ himself noted in his summary of the evidence, there were several reports, thereafter, of Plaintiff's continuing to suffer with migraines.  (*See id.*, at 1078-79; *see also, e.g., id.*, at 428, 2574, 2859.)  Similarly, the ALJ stated that, "[i]n October 2010, [Plaintiff] reported that she had relief of her radicular pain after back surgery" (*id.*, at 1080), without attempting to reconcile this with the fact that the record contained repeated reports, from the months and years thereafter, that Plaintiff's pain had again worsened (*see id.*, at 1078-80; *see also, e.g., id.*, at 471, 675, 952).  The ALJ also stated that Plaintiff had "reported significant improvement with epidural steroid injections in August and September 2011" (*id.*, at 1080), disregarding her later report, in January 2013, that, although she had, by that time, attempted "physical therapy, massage therapy, water therapy, [and] lumbar epidural spinal injections," she had experienced "minimal to no pain relief" (*id.*, at 1079).  On this last point, this Court also notes that the ALJ's characterization of Plaintiff's treatment as "largely conservative" (*id.*, at 1081) seems to have disregarded not only these various attempted

---

[24] White matter disease "is the wearing away of tissue" in your brain. https://www.webmd.com/brain/white-matter-disease.  White matter disease may cause, *inter alia*, balance issues, difficulty learning or remembering new things, and slow thinking.  *Id.*

therapies and the opioid pain medication that Plaintiff had been prescribed, but also the medical records showing that Plaintiff had undergone back surgery, as well as her testimony that she had sought a consultation regarding potential additional surgery, only to be told that a further invasive procedure would be too risky (*see id.*, at 2857 (Plaintiff testifying to having been told by a consulting physician that, if she had further surgery, she could end up paralyzed because "the scar tissue was wrapped around [her] spine").)

 As noted above, an ALJ is "not required to accept the claimant's subjective complaints without question." *Genier*, 606 F.3d at 49.  An ALJ, however, may not pick and choose evidence that supports his conclusion. *Vasquez v. Comm'r of Soc. Sec.*, No. 14cv6900 (JCF), 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015).  I therefore recommend that, upon a further remand, the ALJ be directed to take account of medical evidence from throughout the relevant period in evaluating Plaintiff's subjective complaints of pain.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that Plaintiff's motion for judgment on the pleadings (Dkt. 16) be granted to the extent that the matter be remanded again for further proceedings, and that Defendant's cross-motion for judgment on the pleadings (Dkt. 23) be denied.  I further recommend that, upon remand, the ALJ be directed:

> (1)     to develop the Record by making direct efforts (not just through the assistance of Plaintiff's counsel) to obtain one or more medical source statements, with function-by-function assessments of Plaintiff's physical and mental work-related capacities, from Dr. Nasir and/or other providers who would qualify as acceptable treating sources for purposes of the treating physician rule;

> (2)     upon receipt of such medical source statements from Plaintiff's treater(s), to re-weigh the opinion evidence, giving controlling weight to the opinion of the treating physician(s), unless "good reasons" exist not to do so;

     (3)      to re-evaluate Plaintiff's subjective complaints of pain in light of the medical record as a whole; and

     (4)      to reassess Plaintiff's RFC and ensure that each portion of the RFC determination is supported with opinion or other evidence from medical sources, rather than the ALJ's own lay opinion, and to recall the VE, if necessary to assist in determining if there were jobs available, during the relevant period, for a person with Plaintiff's RFC.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Vernon S. Broderick, United States Courthouse, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Broderick. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
       January 20, 2021

                         Respectfully submitted,

                         _____
                         DEBRA FREEMAN
                         United States Magistrate Judge

<u>Copies to</u>:

All counsel (via ECF)